**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

ARTHUR HOUGHTON,           )

                          )

           Plaintiff,       )

                          )

        v.                )      Civil Action No. 11-0869 (ABJ)

                          )

U.S. DEPARTMENT OF STATE,     )

                          )

          Defendant.    )

———————————————————————)

## <u>MEMORANDUM OPINION</u>

This action involves requests made by plaintiff Arthur Houghton ("Houghton") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2006), and the Privacy Act, 5 U.S.C. § 552a (effective July 21, 2010), seeking documents from the Cultural Property Advisory Committee ("CPAC"), a committee operating under defendant, the Department of State ("State"). Houghton seeks a declaratory judgment that State violated FOIA and the Privacy Act by failing to fulfill his request for records, and an injunction compelling State to comply with his requests. Compl. ¶ 2. State has moved for summary judgment. [Dkt. # 16]. Because the Court cannot find on this record that State conducted an adequate search, but it finds that State properly withheld two responsive documents under FOIA Exemption 3, and that the withheld documents are not subject to the Privacy Act, the Court will deny State's motion in part and grant it in part.

## I.      BACKGROUND

The background facts of this case are undisputed, except where noted. *See* Def.'s Statement of Undisputed Facts [Dkt. # 16]; Pl.'s Response to Def.'s Statement of Undisputed Facts, [Dkt. # 18-1]. CPAC is "a panel of experts representing different interests charged with

advising the President and his designees within State" regarding the handling of cultural goods found at archeological sites.  Compl. [Dkt. # 1] ¶ 4; *see also* 19 U.S.C. § 2605 (2006).  CPAC was established under the Cultural Property Implementation Act, 19 U.S.C. §§ 2601–2613 (2006), which implements the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property ("Convention").  Grafeld Decl. [Dkt. # 16-1] ¶ 15.  As part of its responsibility to advise the President and his designee, CPAC "accepts written and oral comments from the public" and conducts hearings for the public to share their views on import restrictions.  Compl. ¶ 17.  Additionally, CPAC may convene closed meetings "whenever and to the extent it is determined by the President or his designee that the disclosure of matters involved in the Committee's proceedings would compromise the Government's negotiating objectives or bargaining positions."  19 U.S.C. § 2605(h).

The Bureau of Educational and Cultural Affairs ("ECA"), a component of State, receives recommendations from CPAC and is responsible for maintaining CPAC's records.  Compl. ¶ 6.

Houghton served on CPAC from 1983 to 1987.  Compl. ¶ 4.  Since then, Houghton has continued to be interested in CPAC and has testified at public CPAC meetings.  *Id.*  Specifically, he has testified regarding his "concerns about requests for import restrictions on cultural goods made by the Republic of Italy and the Republic of Greece."  *Id.* ¶ 17.

## A.  Houghton's Requests

On March 30, 2011, Houghton sent a FOIA request to State seeking:  (1) "Any dossier or paper, referencing Arthur Houghton, Arthur A. Houghton, Arthur A. Houghton III, or any other variant of that name prepared or submitted by, or compiled in connection with, any proceeding of the Cultural Property Advisory Committee by committee member Joan Connelly"; and

(2) "The transcript of any proceeding reflecting the use of any such dossier or paper."[1]  Ex. 2 to Grafeld Decl. at 2.  Professor Joan Connelly ("Connelly") is a member of CPAC whose role is to "represent[] the interests of the archaeological community."  Compl. ¶ 18.  State acknowledged receipt of the corrected FOIA request on April 7, 2011.  Grafeld Decl. ¶ 6; Ex. 3 to Grafeld Decl. at 1.  Houghton subsequently sent a letter to State clarifying that he was seeking the information under the Privacy Act as well as under FOIA.  Grafeld Decl. ¶ 8; Ex. 5 to Grafeld Decl. at 1.

### B.  This Action

Plaintiff filed this action on May 9, 2011.  At that time, he had not received a response from State regarding his FOIA or Privacy Act requests.  The two counts allege that State violated FOIA and the Privacy Act respectively by failing to release the requested material or allowing plaintiff to correct any inaccurate information about him.  Compl. ¶¶ 20–22, 23–25.  Houghton seeks an order compelling State to release all records responsive to his requests.

After plaintiff filed this action, the Court ordered State to file a dispositive motion or, in the alternative, a report setting forth a schedule for producing documents to plaintiff.  [Dkt. # 14].  In response, State filed the instant motion for summary judgment.  [Dkt. # 16].  In support of the motion, State also submitted two declarations from Margaret Grafeld ("Grafeld") describing State's search for documents.  Grafeld Decl. [Dkt. # 16-1]; Supp. Grafeld Decl. [Dkt. # 19-1].[2]  Grafeld oversees State's Office of Information Programs and Services ("IPS"), which

---

1  Houghton sent a first request on March 29, 2011, but later asked that his request from March 30 replace that original request.  Ex. 2 to Grafeld Decl. [Dkt. # 16-1] at 1.  Because State acknowledged receipt of his revised request, Ex. 3 to Grafeld Decl. [Dkt. # 16-1] at 1, the Court will treat the March 30 letter as the operative FOIA request for purposes of this opinion.

2  The first Grafeld declaration ("Grafeld Decl.") was filed as an exhibit to State's motion for summary judgment, [Dkt. # 16-1], and the second Grafeld declaration ("Supp. Grafeld Decl.") was filed as an exhibit to State's reply in support of its motion for summary judgment, [Dkt. # 19-1].

is the office responsible for responding to FOIA requests.  Grafeld Decl. ¶ 1; Supp. Grafeld Decl. ¶ 1.

The searches under Houghton's first request did not yield any results.  Grafeld Decl. ¶ 21; Ex. 6 to Grafeld Decl. ("State Response Letter") [Dkt. # 16-1] at 1.  In response to Houghton's second request, State retrieved transcripts of closed CPAC meetings from November 13, 2009, and May 6, 2010 ("CPAC transcripts" or "transcripts").  Grafeld Decl. ¶¶ 21, 39–42; State Response Letter at 1.  At each of these meetings, CPAC members discussed, in connection with a Memorandum of Understanding between the United States and Italy, a publicly available letter written by Houghton in 1985.  Grafeld Decl. ¶¶ 40, 42.

State has withheld both documents in full, claiming that they fall under FOIA Exemption 3, and are not subject to the Privacy Act.  Grafeld Decl. ¶ 38; Mem. in Support of Def.'s Mot. for Summ. J. ("Def.'s Mem.") [Dkt. # 16] at 11–15.  Houghton challenges the reasonableness of State's search, State's failure to segregate exempt parts of the CPAC transcripts from non-exempt parts, and State's claim that the CPAC transcripts are not subject to disclosure under the Privacy Act.

## II.    FOIA REQUEST

### A.  Standard of Review

"FOIA cases are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009).  In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate.  *Weisberg v. DOJ*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980), quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).  However, a plaintiff "cannot rebut the good faith

presumption" afforded to an agency's supporting affidavits "through purely speculative claims about the existence and discoverability of other documents." *Brown v. DOJ*, 742 F. Supp. 2d 126, 129 (D.D.C. 2010), quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citations omitted).

In any motion for summary judgment, the Court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). However, where a plaintiff has not provided evidence that an agency acted in bad faith, "a court may award summary judgment solely on the basis of information provided by the agency in declarations." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009). The district court reviews the agency's action de novo, and "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B) (2006); *accord Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

### B. Analysis

The purpose of FOIA is to require the release of government records upon request and to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). At the same time, Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982); *see also Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003) ("FOIA represents a balance struck by Congress between the public's

right to know and the government's legitimate interest in keeping certain information confidential."). The Supreme Court has instructed that FOIA exemptions are to be "narrowly construed." *Abramson*, 456 U.S. at 630.

To prevail in a FOIA action, an agency must satisfy two elements. First, the agency must demonstrate that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Ogelsby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir 1990). "[A]t the summary judgment phase, an agency must set forth sufficient information in its affidavits for a court to determine if the search was adequate." *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), citing *Ogelsby*, 920 F.2d at 68. Such agency affidavits attesting to a reasonable search "are afforded a presumption of good faith," *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) ("*Defenders of Wildlife I*"), and "can be rebutted only 'with evidence that the agency's search was not made in good faith.'" *Id.*, quoting *Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001). Second, an agency must show that "materials that are withheld . . . fall within a FOIA statutory exemption." *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.C. Cir. 2005). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011), citing *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).

1. Whether State Conducted Adequate Searches

Houghton first claims that State has not met its burden to prove that its searches were adequate. Mem. in Support of Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") [Dkt. # 18]

at 4–6.  "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999), quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).   "To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search."  *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009) ("*Defenders of Wildlife II*").   However, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate."  *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis omitted).   The process of conducting an adequate search for documents requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise" and is "hardly an area in which the courts should attempt to micromanage the executive branch."  *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (internal quotation marks and citations omitted).   However, an agency "'cannot limit its search' to only one or more places if there are additional sources 'that are likely to turn up the information requested.'"  *Valencia-Lucena*, 180 F.3d at 326, quoting *Ogelsby*, 920 F.2d at 68.

State contends that its search was reasonable because it "conducted an extensive search of all systems and files thought to contain responsive information."   Def.'s Mem. at 6.  According to the Grafeld declarations, State first identified "the [State] components most likely to contain responsive records":  Central Foreign Policy Records' Central File ("Central File"), and the records of the Bureau of Educational and Cultural Affairs ("ECA"), which encompasses the Cultural Heritage Center ("CHC").   Grafeld Decl. ¶¶ 12–13.

The Central Foreign Policy Records' Central File includes more than thirty million documents and is the "most comprehensive and authoritative compilation of documents" at State. *Id.* ¶ 13.   Among other things, "the Central File includes official record copies of . . . position papers and reports; memoranda of conversations; and interoffice memoranda."   *Id.*   State's search was conducted through the Central File's automated interface, which "encompass[es] all documents in the Central File."   *Id.*   The IPS researcher who conducted the search of the Central Foreign Policy Records' Central File "conducted a full-text search" of the Central File using several variants of Houghton's name, including all three variants expressly provided in the request.   *Id* ¶ 14.   Because Houghton's request sought only information related to Connelly, the date range for the search stretched as far back as Professor Connelly's membership on CPAC and included records through the end of Connelly's CPAC membership on August 29, 2011.[3] Supp. Grafeld Decl. ¶ 5.

State's search in response to Houghton's request also included searches of CHC paper and electronic records.   Grafeld Decl. ¶¶ 17, 20.   CHC's paper files contain information about CPAC meetings, including "agendas, memoranda, summary minutes of meetings, meeting announcements, correspondence, testimony, and other material relating to the responsibilities of the CPAC."   *Id.* ¶ 16.   Its electronic files include information about CPAC meetings, including travel plans, attendance sheets, and transcripts of meetings.   *Id.* ¶ 18.   The CHC electronic files also include email records from CHC staff members and the general CHC email account.   *Id.*

---

3       Although State acknowledged Houghton's revised FOIA request from March 30, 2011, in a letter dated April 7, 2011, Ex. 3 to Grafeld Decl. [Dkt. # 16-1] at 1, in its declaration it quotes Houghton's original FOIA request.  Grafeld Decl. ¶ 14.  However, because the declarant quoted the wrong letter only in explaining her method for selecting the date range for the search, and because both the original and revised requests contained the same date restrictions, this error does not change the analysis of the adequacy of the search.

State's declarant further explained that State's search eventually included all dates of Connelly's CPAC membership, which ended on August 29, 2011.  Supp. Grafeld Decl. ¶ 5.

¶ 19.  In conducting the paper record search, the analyst "visually scan[ned] . . . the relevant [paper] files and folders" and "visually scanned . . . electronic versions" of indices of hard copy transcripts that were "the same as the electronic versions."  *Id.* ¶ 17.  With respect to the electronic records, the CHC analyst searched electronic files, including emails, using variants of Houghton's name as the search terms.  *Id.* ¶ 20.  The date range for this search mirrored the date range for the Central File search.  *Id*.  State asserts that the search of the ECA records, which includes the email accounts of CHC staff members and the CHC office, "would reasonably be expected to produce any existing correspondence in the files between Professor Connelly and the Department," yet the search did not yield any responsive emails or other records sent from or received by Professor Connelly.  Supp. Grafeld. Decl. ¶ 7.

Houghton's challenge to the adequacy of the search is that State has "failed to address why it did not search . . . an obvious source for the information Houghton requested – emails sent or received by Connelly or any of Connelly's files."  Pl.'s Opp. at 5.  In support of this assertion, Houghton relies on the D.C. Circuit's recent decision in *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504 (D.C. Cir. 2011).  *Id.*

In *Ancient Coin Collectors Guild*, the plaintiff sought records from State relating to import restrictions on cultural artifacts.  641 F.3d at 509.  As part of its search in response to plaintiff's FOIA request, State searched ECA staff emails as well as the archived emails of one ECA staff member.  *Id.* at 514.  The plaintiffs argued that State's search was inadequate because State did not explain whether it had access to the archived emails and backup tapes of its other employees and why it failed to search those files.  *Id.*  The court held that State was reasonably expected to inform the court and plaintiffs whether archived emails and backup tapes existed,

and, if so, whether they were practically searchable and whether a search would be likely to return additional responsive material.  *Id.* at 515.

On remand, the district court found that State had access to backup tapes and archived emails, but it was not required to search those records because "additional searches would . . . be unlikely to result in additional responsive material . . . ."  *Ancient Coin Collectors Guild v. U.S. Dep't of State*, Civil No. 07-2074, 2012 WL 2103213, at *4 (D.D.C. June 11, 2012). Furthermore, the Court found persuasive State's argument that even if the electronic backup system did contain additional responsive documents, the form of the backup system would make further searches inconvenient and futile.  *Id.*

Based on the Circuit Court's decision in *Ancient Coin Collectors Guild*, Houghton claims that State must at least address "whether it possesses emails for Connelly or any of Connelly's [f]iles or whether it even asked Connelly if she maintained any relevant documents."  Pl.'s Opp. at 5–6.

For a document to be subject to FOIA, it must first be an "agency record," which requires that (1) the agency "must either create or obtain the requested materials," and (2) the agency "must be in control of the requested materials at the time the FOIA request is made.  *DOJ v. Tax Analysts*, 492 U.S. 136, 144–145 (1989) (internal quotation marks and citations omitted). "Control" means that "the materials have come into the agency's possession in the legitimate conduct of its official duties."  *Id.* at 145.  "This requirement . . . is not so broad as to include personal materials in an employee's possession, even though the materials may be physically located at the agency."  *Id.*  Therefore, State was not required to ask Connelly whether she maintained any relevant documents or to search her personal files for documents.  However, under *Ancient Coin Collectors Guild*, if Connelly maintained an official email address at State,

State is required to either search that account for responsive records or explain why such a search is not required under FOIA in this case.

The declarations submitted by the defendant fail to state whether Connelly was provided with a State email account as part of her service as a CPAC member or not.  The supplemental Grafeld declaration states that State searched the email accounts of CHC staff members and the CHC office email account, Supp. Grafeld Decl. ¶ 7, but this does not seem to include Connelly, as neither of the parties describes her as a CHC employee.

However, plaintiff does refer to Connelly as a "special government employee," and State does not contest that description.  Pl.'s Opp. at 1.  Furthermore, the CPAC website describes CPAC members as "special employees" of the State Department.  *See* U.S. Dep't of State, Bureau of Educ. and Cultural Affairs, *Cultural Prop. Advisory Comm.*, http://exchanges.state.gov/heritage/culprop/committee.html (last visited July 10, 2012) ("Members of the Committee are Special Employees of the Department of State, receive a security clearance, and may have access to confidential information.").  That description suggests that Connelly may have been treated as an employee of State in some ways, so the Court cannot rule out the possibility that she might have held a State Department email account. State's vague statements that "[t]here exists no other Department source where Professor Connelly's records would reasonably be maintained" and "[t]here exist no other sources within the Department where responsive documents may reasonably be expected to be found," Supp. Grafeld Decl. ¶¶ 7–8, do not clearly illuminate that question.

Ultimately, since the Court is required to draw all inferences in favor of the non-moving party at this stage in the litigation, the Court cannot infer from State's declarations that Connelly's emails are not agency records.  Accordingly, the Court will deny defendant's motion

for summary judgment as to the adequacy of its search.  State will be required to submit to the Court an additional brief explaining whether Connelly utilized a State Department email account at any point during the relevant time period, and if so:  (1) setting out a schedule for searching the email account and producing either the responsive documents or a Vaughn index asserting FOIA exemptions, or (2) explaining why FOIA does not require it to search the email files in this case.

   2.   Whether State Properly Withheld the Two Transcripts in Dispute

Houghton next alleges that State improperly withheld the CPAC transcripts that were retrieved under the search conducted for Houghton's second FOIA request because State did not properly segregate the parts of the transcripts that are exempt under 5 U.S.C. § 552(b)(3) ("Exemption 3") from the parts that are not exempt.  Pl.'s Opp. at 6–7.  The Court will first address whether any part of the transcripts fall under FOIA Exemption 3; it will then address whether the parts of the transcripts that are exempt from disclosure, if any exist, are segregable from any parts that are not.

When an agency seeks to withhold a document from disclosure, it must specify the exemption claimed and explain why it is entitled to claim it.  *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007), quoting *King v. DOJ*, 830 F.2d 210, 219 (D.C. Cir. 1987) (internal citations omitted).  The agency bears the burden of justifying the decision to withhold records under FOIA's statutory exemptions.  *See* 5 U.S.C. § 552(a)(4)(B).  A court may grant summary judgment based solely on information provided in an agency's affidavits or declarations if they "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."

*Casey*, 656 F.2d at 738.  Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs., Inc.*, 926 F.2d at 1200 (internal quotation marks and citations omitted).

In order to properly withhold documents under Exemption 3, an agency "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute."  *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009), citing *Fitzgibbon v. CIA.*, 911 F.2d 755, 761–62 (D.C. Cir. 1990).  A matter falls under Exemption 3 if it is "specifically exempted from disclosure by [a] statute" that either (1) "requires that . . . matters be withheld from the public in such a manner as to leave no discretion on the issue"; or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  A "withholding statute" "must on its face exempt matters from disclosure" and there must be a "congressional purpose for exempt[ing] matters from disclosure in the actual words of the statute . . . ."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (internal quotation marks, citations, and emphasis omitted).

State first claims that the transcripts are exempt from disclosure based on section (h) of the Cultural Property Implementation Act ("CPIA"), 19 U.S.C. § 2605, which established CPAC. Def.'s Mem. at 7.  It is settled law in this Circuit that 19 U.S.C. § 2605(h) is an Exemption 3 withholding statute.  *Ancient Coin Collectors Guild*, 641 F.3d at 511.

Section (h) states that the provisions of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1–16, shall apply to CPAC, but it expressly excepts the sections of FACA that require that meetings be open to the public and that transcripts of those meetings be publicly available.  19 U.S.C. § 2605(h); 5 U.S.C. app. 2 §§ 10(a)–(b), 11.  In addition, the CPIA states

specifically that the sections of FACA "relating to open meetings . . . and public availability of documents" do not apply "whenever and to the extent it is determined by the President or his designee that the disclosure of matters involved in the Committee's proceedings would compromise the Government's negotiating objectives or bargaining positions . . . ."  19 U.S.C. § 2605(h).  The D.C. Circuit has found unambiguously that this provides "particular criteria" for withholding disclosure of CPAC proceedings, and therefore qualifies as an Exemption 3 withholding statute.  *Ancient Coin Collectors Guild*, 641 F.3d at 510–11.  Accordingly, whenever the President or his designee determines that the disclosure of matters involved in the CPAC's proceedings would compromise the government's negotiating objectives or bargaining positions, those proceedings are closed to the public and may be properly withheld under FOIA Exemption 3.  *Id*.

State has submitted a declaration stating that the President's designee, the ECA Assistant Secretary, determined that the disclosure of the proceedings at issue here would compromise the government's negotiating objectives.  Grafeld Decl. ¶ 30.  Because this is an "uncontradicted, plausible" affidavit, it is sufficient to prove that State properly withheld at least part of the two

responsive CPAC transcripts under Exemption 3.  *Ancient Coin Collectors Guild*, 641 F.3d at 509.[4]

### 3.   Whether the CPAC Transcripts are Segregable

Houghton further argues that even if parts of the two responsive CPAC transcripts fall under Exemption 3, State has failed to fulfill its duty to segregate the exempt portions of the transcripts from the non-exempt portions of the transcripts.

Even if a matter is exempt from FOIA disclosure, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

---

4       State also claims that the CPAC transcripts fall under Exemption 3 based on Sections (i)(1) and (i)(2) of the CPIA.  Grafeld Decl. ¶¶ 31–38.  Section (i) provides:  "Any information . . . submitted in confidence by the private sector to officers or employees of the United States or to [CPAC] in connection with the responsibilities of [CPAC] shall not be disclosed to any person other than" officers or employees of the United States, certain members of Congress, or members of CPAC.  19 U.S.C. § 2605(i)(1).  Additionally, "[i]nformation submitted in confidence by officers or employees of the United States to [CPAC] shall not be disclosed other than in accordance with rules issued by the Director of the United States Information Agency, after consultation with [CPAC]."  *Id.* § 2605(i)(2).  Although § 2605(i)(1) – and presumably (i)(2) – is a withholding statute, *Ancient Coin Collectors Guild*, 641 F.3d at 511, "the government is not entitled to a blanket presumption that investigatory sources speak under a commitment to confidentiality.  *Id.*, citing *DOJ v. Landano*, 508 U.S. 165, 178 (1993).  Instead, an agency must present evidence showing that information was submitted in confidence, such as "notations on the face of a withheld document, the personal knowledge of an official familiar with the source a statement by the source or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  *Id.*, quoting *Campbell v. DOJ*, 164 F.3d 20, 34 (D.C. Cir. 1998).  Although State may not have met its burden to show that the withheld transcripts are "confidential information" for purposes of 19 U.S.C. § 2605(i), the Court is satisfied that State has met its burden with respect to section 2605(h), and thus has established that withholding both transcripts was proper.

The Court agrees with State's claim that the entirety of the CPAC meeting transcripts are properly withheld in full under Exemption 3 since the documented meetings were closed pursuant to 19 U.S.C. § 2605(h).   Under the withholding statute, once the President or his designee at State has determined that a CPAC proceeding is closed pursuant to section 2605(h), all materials "involved in" such proceedings are exempt from FOIA.  *Ancient Coin Collectors Guild*, 641 F.3d at 511.   An agency declaration "not[ing] that the proper official made . . . a determination" that the meetings were closed under section 2605(h) is sufficient to demonstrate that involved materials are exempt.  *Id.*  Here, State has submitted the Grafeld declaration, which explains that the ECA Assistant Secretary, who has the designated authority to close proceedings, has determined that both CPAC meetings at issue here were closed pursuant to that statute.   Grafeld Decl. ¶ 30.   Therefore, the full transcripts of the meetings are exempt from FOIA as materials "involved in" the proceedings.  *See Ancient Coin Collectors Guild*, 641 F.3d at 510–512.

Because the transcripts are privileged in full pursuant to 19 U.S.C. § 2605(h), the Court

concludes that no portion of the transcripts are segregable.[5]

## III.     PRIVACY ACT REQUEST

"[A]ccess to records under [FOIA and the Privacy Act] is available without regard to

exemptions under the other." *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1184 (D.C.

Cir. 1987).  Accordingly, the Court will next turn to Houghton's Privacy Act claims.

---

5       Additionally, even if the Court were required to apply the segregability analysis to the
two transcripts, it would find that State has met its burden of showing that the transcripts are
non-segregable.
       "[I]t has long been the rule in this Circuit that non-exempt portions of a document must
be disclosed *unless* they are inextricably intertwined with exempt portions." *Wilderness Soc. v.
U.S. Dep't of Interior*,  344 F. Supp. 2d 1, 18 (D.D.C. 2004), quoting *Mead Data Cent., Inc. v.
U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  And the agency bears the burden
of showing that a document is non-segregable. *Army Times Pub. Co. v. Dep't of Air Force*, 998
F.2d 1067, 1071 (D.C. Cir. 1993).  An agency may meet this burden by providing a detailed
Vaughn Index of each disclosure and affidavits describing segregability.  *See Johnson v. Exec.
Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002).  "The adequacy of the Vaughn
Index . . . turns on whether the agency has sufficiently explained why there [are] no reasonable
means of segregating factual material from the claimed privileged material." *Wilderness Soc.*,
344 F. Supp. 2d at 18.  A "blanket declaration that all facts are so intertwined" is not sufficient to
prove this burden. *Id.* at 19.  Instead, an agency must provide the reasons behind its conclusions,
how much of the withheld information is non-exempt, and how that material is dispersed
throughout a withheld document. *Mead Data Cent.*, 566 F.2d at 261.
       State has submitted a Vaughn Index and a declaration from Margaret Grafeld that
describe the contents of both withheld transcripts.  With respect to the transcript from November
13, 2009, the Vaughn Index and Grafeld declaration explain that the Committee discussed a
letter written by Houghton in connection with a Memorandum of Understanding with Italy that
imposes restrictions on certain archaeological materials from Italy.  Grafeld Decl. ¶ 40.  The
Committee again discussed this letter at the CPAC meeting on May 6, 2010, in connection with
the same Memorandum of Understanding.  *Id.* ¶ 42.  Declarant Grafeld explains that
"[d]isclosure of any portion of the transcripts could undermine the very purpose of the
Convention and the CPIA" because "disclosure of certain information about the nature [and]
location of the items under consideration for import restrictions can affect the markets for such
time." *Id.*  Since the letter was mentioned during a discussion of the Memorandum of
Understanding concerning items under consideration for import restrictions, the Court finds that
they are not segregable from the material that would compromise the government's negotiating
objectives.  This segregability determination is confirmed by the Court's *in camera* review of the
portions of the transcripts that concern Houghton's letter.

### A.  Standard of Review

When a plaintiff challenges an agency's withholding of documents under the Privacy Act, the court determines *de novo* whether the withholding was proper, and the burden is on the agency to sustain its action.  5 U.S.C. § 552a(g)(2)(A); *Doe v. United States*, 821 F.2d 694, 697–98 (D.C. Cir. 1987) (finding that in this context, *de novo* means "a fresh, independent determination of 'the matter' at stake," and the court need not give "deference . . . to the agency's conclusion") (en banc); *see also Skinner v. DOJ*, 584 F.3d 1093, 1096 (D.C. Cir. 2009).

### B.  Analysis

"[T]he [Privacy] Act 'safeguards the public from unwarranted collection, maintenance, use, and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used." *McCready v. Nicholson*, 465 F.3d 1, 7–8 (D.C. Cir. 2006), quoting *Bartel v. Fed. Aviation Admin.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984).  "The Privacy Act – unlike [FOIA] – does not have disclosure as its primary goal." *Henk v. U.S. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996).  "Rather, the main purpose of the Privacy Act's disclosure requirement is to allow individuals on whom information is being compiled and retrieved the opportunity to review the information and request that the agency correct any inaccuracies." *Id.* at 1456–57.  To achieve this goal, the Act "imposes a set of substantive obligations on agencies that maintain systems of records." *Skinner v. Dep't of Justice*, 584 F. 3d 1093, 1096 (D.C. Cir. 2009).  For example, an agency that maintains a system of records must, "upon request by any individual to gain access to his record . . . permit him . . . to review the record" and to request amendment of the record.  5 U.S.C. § 552a(d)(1)–(2).  Additionally, with certain limited exceptions, agencies are not permitted to

maintain records "describing how any individual exercises rights guaranteed by the First Amendment."  5 U.S.C. § 552a(e)(7).

The Act "provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  *Doe v. Chao*, 540 U.S. 614, 618 (2004).  For example, when an agency improperly withholds documents from an individual, the "court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him."  5 U.S.C. § 552a(g)(3)(A).

1.  <u>Whether the CPAC Transcripts are "Records" Under the Privacy Act</u>

Houghton challenges State's claim that the CPAC transcripts are not subject to the provision of the Privacy Act that requires the government to disclose to an individual information compiled about him.  Pl.'s Opp. at 9–11.

In relevant part, the Privacy Act provides:

> Each agency that maintains a system of records shall . . . upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him.

5 U.S.C. § 552a(d)(1).  Thus, any information that is subject to the disclosure provision of the Privacy Act must be contained in a "record" that is, in turn, contained in a "system of records." *Fisher v. Nat'l Inst. of Health*, 934 F. Supp. 464, 468 (D.D.C. 1996).

A "record" is "any item, collection, or grouping of information *about* an individual that is maintained by an agency. . . and that contains his name . . . or other identifying particular . . . ." 5 U.S.C. § 552a(a)(4) (emphasis added).  In this Circuit, a document must meet the two distinct requirements set forth in the Privacy Act to qualify as a "record":  (1) "information must be 'about' an individual"; and (2) "the information must contain the individual's name or other identifying particular."  *Tobey v. Nat'l Labor Relations Bd.*, 40 F.3d 469, 471 (D.C. Cir. 1994).

The CPAC transcripts undoubtedly meet the second requirement for a "record" because they contain Houghton's name.  However, "the fact that information contains an individual's name does not mean that the information is 'about' the individual." *Id.*

The D.C. Circuit addressed what it means for information to be "about" an individual in *Tobey v. Nat'l Labor Relations Board*, 40 F.3d at 470–71.  *Tobey* concerned a computer database at the National Labor Relations Board ("NLRB") that was "capable of tracking and monitoring unfair labor practice and representation case data" and included "case names, allegations made, dates of significant events and the initials or identifying number of the field examiner assigned to the case.  *Id.* at 470.  The plaintiff was a field examiner at the NLRB who was omitted from a promotion roster after he received a poor performance evaluation.  *Id.* at 470–71.  To write the evaluation, the plaintiff's supervisor at the NLRB had used the plaintiff's initials to search for the files of all cases that that were assigned to the plaintiff.  *Id.* at 471.  The supervisor used these files to draw conclusions about the plaintiff's efficiency.  *Id.* at 470.

The plaintiff claimed that the files in the database were records about him under the Privacy Act because his supervisor had used his initials to retrieve them.  *Id.* at 471.  The court held that the files within the NLRB computer system were not "records" because they were about NLRB cases, not the employees assigned to work on those cases.  *Id.*  It found this to be true even though the files included identifying information for employees assigned to the case. *Id*.  The fact that the files included employee identifying information "no more mean[t] the information [was] 'about' the individual than it mean[t] the information [was] 'about' the date on which the case settled."  *Id.*  Instead, information "about" an individual "actually describes the individual in some way.  *Id.* at 472; *see also Fisher*, 934 F. Supp. at 471 (explaining that in order

for a document to be a "record," it "must provide information concerning or describing the named individual").

Similar to the information in *Tobey*, the CPAC transcripts at issue here do not meet the first prong of the "records" definition because they are not "about" Houghton. Instead, the transcripts are about a Memorandum of Understanding between the Government of the United States and the Government of the Republic of El Salvador concerning the imposition of import restrictions on certain categories of archaeological material from El Salvador, Grafeld Decl. ¶ 40, and a Memorandum of Understanding between the United States and Italy concerning similar restrictions on archaeological material from Italy. Grafeld Decl. ¶¶ 40, 42. Even the parts of the transcripts that mention Houghton are about a letter he wrote that was published in the *Los Angeles Times*, not about him. *Id.*

The opinion of another court in this District is also instructive here. *Fisher v. National Institute of Health* concerned a series of databases operated and maintained by the National Institute of Health that contain information about articles that have been published in biomedical scientific journals. 934 F. Supp. at 467 & n.2. Each file in the database provides bibliographic information about the article, including the title of the article, title of the publication, the name or names of the author or co-authors, and a summary or abstract of the article. *Id.* at 467. In *Fisher*, the Office of Research Integrity at the U.S. Department of Health and Human Services had investigated the plaintiff for scientific misconduct. *Id.* at 466. In the course of the investigation, the office added annotations, such as "scientific misconduct – data to be reanalyzed," to the database entries that contained bibliographic information about articles that the plaintiff had authored. *Id.* at 467.

The plaintiff argued that those entries were "records" for purposes of the Privacy Act because they contained his name and address and because "nothing tells more 'about' a research scientist like Dr. Fisher than his scientific publications, speeches and the like." *Id.* at 469. The court, however, held that the files contained in the database, including the annotations, were not "records" for Privacy Act purposes because the files were "about" the articles, rather than the plaintiff, even though "a reader . . . could glean some insight into the type of work [the plaintiff] did." *Id.* at 470. The Court explained that "[t]he fact that it is possible for a reasonable person to interpret information as describing an individual does not mean the information is about that individual for purposes of the Privacy Act." *Id*.

Similarly, the documents at issue in the instant case are "about" the two Memoranda of Understanding that the CPAC members were discussing. Even the parts that mention plaintiff are "about" the letter that plaintiff had written.[6] Just as in *Fisher*, the mere fact that the transcripts contain reference to or quote from plaintiff's written work is not sufficient to make it a "record." The CPAC transcripts are therefore not records about Houghton for purposes of the Privacy Act, and State is not required to disclose them to Houghton.[7] 5 U.S.C. § 552a(d)(1).

---

6       The Court's *in camera* review of the portions of the withheld documents that reference plaintiff and the letter confirms Grafeld's representation that the transcripts are not about plaintiff, but are about the CPAC proceedings and the Memoranda of Understanding. Even the parts that mention Houghton are about the content of the letter he wrote, not about him.
        The Court also notes that State enclosed a three-page cover memorandum along with the withheld documents that it delivered to the Court pursuant to the Court's June 20, 2012, Minute Order. The Court has not relied on that memorandum for purposes of this opinion or the accompanying order.

7       State also argues that the documents at issue are not subject to the Privacy Act because State does not maintain a requisite "system of records." Def.'s Mem. at 12–15; *see* 5 U.S.C. § 552a(d)(1). Plaintiff raises factual disputes concerning this argument. Pl.'s Response to Def.'s Statement of Undisputed Facts [Dkt. # 18-1] ¶ 10. However, the Court will not reach this issue since it finds that the documents are not "records" under the Privacy Act.

Accordingly, State has met its burden of proving that the transcripts are not subject to sections (d)(1) and (d)(2) of the Privacy Act.

2.  Whether the CPAC Transcripts are Records Describing How Houghton Exercises his First Amendment Rights

Lastly, Houghton challenges State's maintenance of the CPAC transcripts under section 552a(e)(7) of the Privacy Act, Pl.'s Opp. at 8–9, which, with limited exceptions, prohibits agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment."  5 U.S.C. § 552a(e)(7); *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980) (The Privacy Act "clearly prohibits even the mere collection of such a record, independent of the agency's maintenance, use, or dissemination of it thereafter.").  Houghton claims that even if the withheld transcripts are not subject to disclosure under section (d)(1), State is prohibited from maintaining them at all under subsection (e)(7).  Pl.'s Opp. at 8. However, since the Court has already found that the two withheld documents are not "records" under the Privacy Act, subsection (e)(7) does not apply.  *See Reuber v. United States*, 829 F.2d 133, 142 (D.C. Cir. 1987) (explaining that for a claim under section 552a(e)(7), the "threshold inquiry" is whether "the agency 'maintains a record describing' activity of the subject potentially implicating the First Amendment").[8]  Therefore, the Privacy Act does not prohibit State from maintaining the two withheld transcripts.

---

8    Although the court in *Reuber* held that the document was a "record" because it "clearly identifie[d] Reuber by name and address," 829 F.2d at 142, this was a pre-*Tobey* decision, and thus relies on an outdated understanding of the term "record."

## IV.     CONCLUSION

The Court cannot conclude as a matter of law that State conducted an adequate search in response to plaintiff's FOIA request; however, it finds that the two responsive documents State withheld are exempt from disclosure under FOIA Exemption 3 and are not subject to the Privacy Act.

Accordingly, the Court will grant in part and deny in part defendant's motion for summary judgment.  [Dkt. # 16].  State will be required to submit an additional memorandum on or before August 1, 2012 explaining whether Connelly utilized a State Department email account at any point during the relevant time period, and if so:  (1) setting out a schedule for searching the email account and producing either the responsive documents or a Vaughn index asserting FOIA exemptions, or (2) explaining why FOIA does not require State to search the email files in this case.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  July 12, 2012